**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GULF COAST MARITIME SUPPLY, INC. | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil No. 1:16-CV-1461 (TSC) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, *et al.,* | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>DEFENDANTS' MOTION TO DISMISS</u>

Defendants United States of America, John Manfreda, and the Alcohol and Tobacco Tax and Trade Bureau ("Defendants") move to dismiss Plaintiff, Gulf Coast Maritime Supply Inc.'s ("Plaintiff") Complaint, pursuant to Federal Rule of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction.  Specifically, Plaintiff's Complaint should be dismissed because the challenged Agency action is not subject to judicial review.  Defendants submit an accompanying memorandum of points and authorities and a proposed order.  The attached memorandum also

//

//

//

//

14385169.1

incorporates Defendants' opposition to Plaintiff's motion for a preliminary injunction.

Defendants, accordingly, request that the Court dismiss this action for lack of jurisdiction.


Date: September 12, 2016,

Respectfully submitted,

CAROLINE D. CIRAOLO
Principal Deputy Assistant Attorney General
Tax Division

/s/ Ari D. Kunofsky
ARI D. KUNOFSKY
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 227
Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-9187
Fax: (202) 514-6866
Ari.D.Kunofsky@usdoj.gov

CHANNING D. PHILIPS
United States Attorney

DANIL F. VAN HORN
Civil Chief

/s/ Carl E. Ross
CARL E. ROSS
Assistant United States Attorney
U.S. Attorney's Office for the
District of Columbia
555 Fourth Street, N.W.
Washington, D.C. 20530
Tel. (202) 252-2533
Carl.Ross@usdoj.gov

14385169.1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| GULF COAST MARITIME SUPPLY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. 1:16-cv-01461-TSC |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
AND MOTION TO DISMISS**

Plaintiff Gulf Coast Maritime Supply, Inc. ("Gulf Coast") moved for preliminary injunctive relief against Defendants, the United States of America, John Manfreda, and the Alcohol and Tobacco Tax and Trade Bureau (collectively, "United States"), asking the court to order the United States to resuscitate  import and export permits previously held by Gulf Coast. (ECF Docket no. 7.)  As explained more fully below, this Court lacks subject-matter jurisdiction, and the United States moves to dismiss.  Moreover, Gulf Coast has failed to show it is entitled to a preliminary injunction.

For several years, Gulf Coast held basic permits under the Federal Alcohol Administration Act, which allowed it to lawfully engage in business as a beverage alcohol importer and wholesaler, pursuant to 27 U.S.C. § 203.  Gulf Coast also held a tobacco export warehouse permit, which allowed it to purchase tobacco products for export without paying the federal excise tax.  26 U.S.C. § 5702(h).

In exchange for the business benefits of acting under these permits, the applicable provisions place strict requirements on Gulf Coast.  Among other things, a corporation holding one of these permits is required to file an application for a new permit upon change in actual or

1

14363649.7

legal control with the Alcohol and Tobacco Tax & Trade Bureau ("TTB").  27 U.S.C. § 204(g)

(alcohol wholesaler and importer permits); 26 U.S.C. §§ 5712-5713 and 27 C.F.R. § 44.107

(tobacco export warehouse permits).  If no application is filed within 30 days, the permit

terminates by operation of law.  *See id.*  Likewise, the permits themselves warn that they will

automatically terminate within 30 days if there is a change in proprietorship or control.

(*See* Compl. Exs. 5 & 8.)

     Gulf Coast was certainly aware of these strict rules.  In November of 1994, Gulf Coast

reported a change in officers and change in its shareholders.  (Compl. Ex. 1, Ltr. dated Nov. 15,

1994.)

     In 2013, Gulf Coast faced an even more significant change than in 1994.  On August 2,

2013, Salem Geller, a 45% shareholder of Gulf Coast, passed away and his wife, Barbara Geller,

became Gulf Coast's 90% owner when she inherited Salem Geller's 45% interest in the

company.  Despite previously reporting changes to its stock ownership, Gulf Coast did not report

the August 2013 change within 30 days, and indeed operated several years without reporting the

change.  Rather than alert the United States of the change in stock ownership and corporate

control, Gulf Coast continued filing documents with the TTB using the deceased Salem Geller's

signature stamp for the next three years.  (Gov't Ex. 102, Reports Filed in 2015 "signed" by

decedent.)  Based upon the failure to timely report a change in stock ownership and corporate

control, Gulf Coast's permits terminated by operation of law.  *See* 27 U.S.C. § 204(g); 26 U.S.C.

§ 5713(a); 27 C.F.R. § 44.107.

     On April 15, 2016, after becoming aware of the change in ownership, TTB determined

that Gulf Coast's permits terminated by operation of law and informed the company that its

continued operations would be potentially subject to penalties.  (Compl., Ex. 9.)

14363649.7

Gulf Coast now moves for injunctive relief, asserting: (a) Salem Geller's death did not constitute a change in control, and (b) TTB did not follow its procedures for revoking these permits.  The Plaintiff is not entitled to the relief sought as the Court lacks subject-matter jurisdiction and because the arguments are meritless.

First, this Court lacks subject-matter jurisdiction to hear this matter.  With respect to the export warehouse permit for tobacco products, the Anti-Injunction Act, 26 U.S.C. § 7421, deprives the Court of jurisdiction.  The Anti-Injunction Act bars courts from entering orders that would restrain the assessment or collection of federal taxes, and this suit would effectively prevent TTB from assessing excise taxes on the tobacco products Gulf Coast purchased without a valid permit.

As to the basic permit for alcohol, the existence of a permit does not affect the tax liability arising from sales or importation of alcohol.  Even accepting for the sake of argument that TTB's actions constitute a revocation – which they do not – petitions challenging a revocation must be raised within 60 days and courts of appeals are vested with "exclusive jurisdiction."  27 U.S.C. § 204(h).  Because Gulf Coast's complaint was filed more than 60 days after the alleged revocation occurred and was filed in the District Court, this action is barred by the statute of limitations. In addition, this Court lacks subject-matter jurisdiction.  Accordingly, this matter should be dismissed.

Even if the Court does have jurisdiction, a preliminary injunction is not warranted because the Plaintiff has not demonstrated it can meet any of the factors needed for injunctive relief.  First, Gulf Coast cannot show a likelihood of success on the merits.  TTB's conclusion that Gulf Coast's permits automatically terminated was not arbitrary, capricious, an abuse of discretion, or contrary to law.  Indeed, the plain language of the governing statute, the permits

3

themselves, the regulations and TTB's mission all support a finding that Gulf Coast's permit automatically terminated.  Gulf Coast has not applied for a new permit.  Accordingly, TTB is entitled to substantial deference, and the Plaintiff is unable to show that its actions were arbitrary and capricious.

Moreover, Gulf Coast's argument that it was denied procedural protections due under the APA or the corresponding provisions in the Internal Revenue Code and the Intoxicating Liquors' title of the United States Code (Title 27) is similarly unsupported.  *See* 5 U.S.C. §§ 553, 558; 26 U.S.C. § 5713; 27 U.S.C. § 204.  Even if Gulf Coast's argument regarding the procedural process was correct, it has not identified any prejudice from any of TTB's alleged errors.

Turning to the remaining factors for injunctive relief, Gulf Coast cannot show irreparable injury as all of its harms were self-inflicted when it decided not to file a new permit application and instead use a dead man's signature stamp.  Further, Gulf Coast had and still has adequate remedies at law.  Gulf Coast can file a new permit application and then seek judicial review if the permit application is denied.  For the export warehouse permit, Gulf Coast can also indirectly challenge the termination of its export warehouse permit by paying the resulting taxes and filing a refund suit.  Finally, the public policy behind requiring timely disclosures of changes in stock ownership and control by permit holders and the balance of equities weigh in favor of requiring Gulf Coast to comply with the applicable statute and regulations.  Accordingly, the Court should deny plaintiff's request for a preliminary injunction and dismiss the case for lack of jurisdiction.

14363649.7

## STATEMENT OF FACTS

1.      Gulf Coast obtained basic permits from TTB to import and wholesale alcoholic

beverages.  (Complaint, ¶¶ 38, 39.)  The current version of its basic permit provides:

> THIS PERMIT WILL AUTOMATICALLY TERMINATE THIRTY
> DAYS AFTER ANY CHANGE IN PROPRIETORSHIP OR CONTROL
> OF THE BUSINESS, unless an application for a new basic permit is
> made . . . .

(Compl., Ex. 8 (emphasis in original).)[1]

2.      Gulf Coast received its tobacco export warehouse proprietor permit in 1973.

(Compl., Ex. 5.)  The current version of its permit provides:

> [Y]ou are hereby issued this permit to engage in the business indicated
> and to operate in the premises described.  This permit will remain in
> effect on condition that you comply with the applicable provisions of
> 26. U.S.C. Chapter 52, . . . all applicable regulations made pursuant to
> law which are now, or may hereafter be, in force, and until suspended,
> revoked, **automatically terminated,** or voluntarily surrendered as
> provided by law and regulations.  This permit is not transferable.  Any
> **change in** name, address, **ownership, or control** must be immediately
> reported to the [TTB].

(*Id*. (emphasis added).)

3.      Before November of 1994, Salem Geller and Barbara Geller each owned 50% of

the stock in Gulf Coast.  (Compl., Ex. 1.)  On November 15, 1994, the Plaintiff contacted TTB to

report a 10% change in stock ownership and change in corporate officers.  *Id*.  In that letter, Gulf

Coast reported that it issued 45% of its stock to Salem Geller, 45% of its stock to Barbara Geller,

and 10% to Jay Geller, their son.  *Id*.

4.      Salem Geller passed away on August 2, 2013.  (Compl., ¶ 23.)

5.      His obituary reported that Salem Geller was Gulf Coast's "primary owner and

operator."  (Compl. Ex. 2.)

---

[1] Gulf Coast has a permit to import alcoholic beverages as well as sell them at wholesale.

6.      According to Gulf Coast, Salem Geller's stock transferred to a probate estate, and Barbara Geller was appointed as executrix. (Compl., ¶¶ 25-26.)  Barbara Geller then obtained sole control of the 90% interest in Gulf Coast via a partition agreement.  (Compl., ¶ 27.)

7.      Gulf Coast, through its General Manager Jay Goldstein, used decedent Salem Geller's signature stamp to file reports with the TTB before and after Sam Geller's death.  (Decl. of Brent Wachholder ("Wachholder Decl."), ¶ 8; Gov't Ex. 101, Interview Notes.)

8.      On April 14, 2016, TTB determined that Gulf Coast's permits terminated by operation of law.  TTB informed the company that any continued operation would be taxable and potentially subject to civil and criminal penalties.  (Compl. Ex. 9.)

9.      On May 31, 2016, TTB issued an inquiry letter.  (Compl., Ex. 10.)  In this letter, TTB explained that because Gulf Coast had been operating without a valid export warehouse proprietor permit, Gulf Coast owed in total $7,836,787 in unpaid excise taxes, interest, and penalties for the monthly tax-periods from October 1, 2013 through March 31, 2016.  *Id*

10.     Gulf Coast is continuing to operate throughout these proceedings and has not filed a new application for either a basic permit or export warehouse permit. (Wachholder Decl.,¶ 9.)

# ARGUMENT

## I. THIS COURT LACKS SUBJECT-MATTER JURISDICTION.

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance." *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (internal citation and quotation marks omitted). "[I]t is presumed that a cause lies outside [the federal courts'] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence that the Court possesses jurisdiction. *See, e.g., U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer*, 778 F. Supp. 2d 37, 43 (D.D.C. 2011) (citing *Hollingsworth v. Duff*, 444 F. Supp. 2d 61, 63 (D.D.C. 2006)). Thus, the "'plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim.'" *Id.* (quoting *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (internal citation and quotation marks omitted)).

Jurisdiction must be established in each type of case brought before the Court, including APA challenges. While the "APA generally establishes a cause of action for those suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," the "APA does not apply, however, to the extent that . . . statutes preclude judicial review." *Texas Alliance for Home Care Services v. Sebelius*, 681 F.3d 402, 408 (D.C. Cir. 2012) (internal quotations omitted); 5 U.S.C.§ 701(a)(1)(stating that the judicial review provisions of the Administrative Procedure Act are inapplicable to the extent that "statutes preclude judicial review"). As the Supreme Court explained "[w]hether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the

7

14363649.7

structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). While courts employ a presumption in favor of permitting review of administrative action, that presumption is defeated when, as in the instant case, "congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'" *Id.* at 351 (quoting *Ass'n of Data Processing Serv'c Org. v. Camp*, 397 U.S. 150, 157 (1970)).

### A.   The Anti-Injunction Act Deprives the Court of Jurisdiction to Grant Injunctive Relief Regarding the Export Warehouse Permit.

The Anti-Injunction Act bars suits when the "obvious purpose" is "to reduce payment of taxes." *Florida Bankers Ass'n v. Dep't of the Treasury*, 799 F.3d 1065, 1071 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 2429 (2016), *citing Z Street v. Koskinen*, 791 F.3d 24, 28–29 (D.C. Cir. 2015). The statute provides that "[n]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." 26 U.S.C. § 7421. The Anti-Injunction Act thus "protects the Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct the collection of taxes. Because of the Anti–Injunction Act, taxes can ordinarily be challenged only after they are paid, by suing for a refund." *NFIB v. Sebelius*, 567 U.S. ___, ___, 132 S. Ct. 2566, 2583 (2012).

The Anti-Injunction Act is read "broadly to encompass almost all premature interference with the assessment." *RYO Machines, LLC v. Dep't of Treas.*, 696 F.3d 467, 471 (6th Cir. 2012) (applying Anti-Injunction Act to TTB actions); *accord Int'l Lotto Fund v. Virginia State Lottery Dep't*, 20 F.3d 589, 591 (4th Cir. 1994). "Regardless of how the claim is labelled, the effect of an injunction here is to interfere with the assessment or collection of a tax." *Int'l Lotto*, 20 F.3d at 591. In light of its broad preclusive effect, the Anti-Injunction Act acts as a bar to suits that seek to restrain assessment or collection, as well as those actions directed at the means of

assessment or collection. *See Seven-Sky v. Holder*, 661 F.3d 1, 8, 10, 12 (D.C. Cir. 2011), *cert denied*, 133 S. Ct. 63 (2012), *abrogated on other grounds*, *NFIB*, 132 S. Ct. 2566.

Because interference "with ancillary functions to tax collection" is prohibited under the Anti-Injunction Act, courts have dismissed a broad range of legal actions challenging agency action that, at first blush, might not appear directly related to assessment or collection. *See, e.g., Bob Jones Univ. v. Simon*, 416 U.S. 725, 738 (1974) (suit to enjoin Internal Revenue Service from withdrawing plaintiff's tax-exempt status barred by AIA); *Investment Annuity, Inc. v. Blumenthal*, 609 F.2d 1, 4 (D.C. Cir. 1979) (barring suit to enjoin enforcement of Revenue Ruling related to whether insurance policyholders or insurance companies "owned" income-generating assets); *RYO Mach.* 696 F.3d at 471 (barring suit where the acquisition of a tobacco-manufacturing related "permit is intertwined with the overall tax scheme for tobacco manufacturers, and so a challenge to the permit is equally barred by the AIA.").[2]

---

[2] *See also Int'l Lotto Fund*,  20 F.3d at 591-592 (barring suit to enjoin withholding on Australian entity's lottery winnings, even though a treaty exempted the winnings from tax); *Smith v. Rich*, 667 F.2d 1228, 1230 (5th Cir. 1982) (barring suit to enjoin issuance of administrative summonses); *Kemlon Prod. & Dev. Co. v. United States*, 638 F.2d 1315, 1316, 1318, 1320 (5th Cir. 1981) (barring "suits to enjoin IRS agents from disclosing information in corporate tax returns to third parties as part of an audit investigation"), *modified by* 646 F.2d 223 (5th Cir. 1981); *United States v. Dema*, 544 F.2d 1373, 1376 (7th Cir. 1976) (barring suit to restraining the Internal Revenue Service from issuing subpoenas for taxpayer's books); *Lewis v. Sandler*, 498 F.2d 395, 398-399 (4th Cir. 1974) (barring "suits to enjoin local officials from giving the IRS information about narcotics traffickers used by the IRS to make jeopardy assessments"); *Koin v. Coyle*, 402 F.2d 468, 469 (7th Cir. 1968) (barring suit "to prevent the IRS from using evidence it had allegedly obtained illegally as the basis for a tax assessment"); *Campbell v. Guetersloh*, 287 F.2d 878, 879, 880-881 (5th Cir. 1961) (barring "suits to enjoin the IRS from using particular methodologies to calculate tax deficiencies"); *Koin v. Coyle*, 402 F.2d 468 (7th Cir. 1968) (holding that an injunction restraining the IRS from using certain evidence is barred by the Act); *Lewis v. Sandler*, 498 F.2d 395 (4th Cir. 1974) (barring suit to prevent police from furnishing to the IRS information about persons suspected of selling narcotics); *Blech v. United States*, 595 F.2d 462, 466 (9th Cir. 1979) (rejecting "ably argued" contention that suit would not restrain assessment or collection; "[t]o hold otherwise would enable ingenious counsel to so frame complaints as to frustrate the policy or purpose behind the Anti-Injunction [Act]").

9

Gulf Coast pays lip service to this statute, arguing that it is not seeking to enjoin taxes, but merely seeking a ruling to allow it to preserve an export warehouse proprietor permit that lets it obtain and transfer tobacco products without payment of tax.  (Pl's Mem. in Supp., p. 22.) Gulf Coast cites to three cases involving export permits issued by **non-taxing agencies** for the proposition that the Anti-Injunction Act does not apply here. (Pl's Mem. p. 22.) None of those cases, however, discuss or even cite the Anti-Injunction Act, which is unremarkable since the agencies involved were not taxing agencies.  And none of those cases involved the TTB or its predecessors.  As explained more fully below, Gulf Coast is directly liable now for the excise tax on these tobacco products because it operated without an export warehouse permit.  The narrow judicial exceptions to the Anti-Injunction Act are unavailing in this action.

### i. The Anti-Injunction Act Applies Here.

Because Gulf Coast did not have the requisite export warehouse permit, it may be liable for tax on the tobacco products that it accepted and sold, because the manufacturer had no reason to pay the applicable excise tax.  26 U.S.C. § 5703(a)(2).  Gulf Coast may also be liable for penalties, which are treated in the same manner as a tax, for receiving untaxed tobacco products while not being an export warehouse proprietor.  26 U.S.C. § 5761(c), (e).  TTB informed Gulf Coast through an inquiry letter that it may owe $7.8 million in unpaid taxes relating to untaxed tobacco products it obtained and sold after the automatic termination of its permit through March 31, 2016.  (Inquiry Letter, Compl. Ex. 10.)

This inquiry letter is part of an administrative process, and TTB may subsequently assess these excise taxes against Gulf Coast.  26 U.S.C. § 5703(d).  If Gulf Coast then pays these taxes

14363649.7

for a single one-month tax period,[3] then it can make a claim for a refund and ultimately sue in District Court for a refund if the claim is denied or not acted on within six months.  26 U.S.C. §§ 6423(a), 6532(a), 7422(a).  The Anti-Injunction Act funnels Gulf Coast into this administrative process rather than allowing it to seek premature review.

Gulf Coast asserts it is seeking injunctive relief unrelated to assessment or collection of the excise taxes.  (Pl's Mem., p. 22, n.6.)  It argues that the suit is not barred because Gulf Coast is not asking "this Court to allow it to continue dealing in untaxpaid alcohol and tobacco products without holding . . . an export warehouse permit — which plaintiff clearly is not doing — such an action might have violated the Anti-Injunction Act."  *Id*.  To the contrary, Gulf Coast explicitly seeks to have the determination that the export warehouse permit terminated set aside. (Compl., Prayer for Relief, ¶ B.)  The effect of this determination would be that Gulf Coast would not owe the $7.8 million in excise taxes listed in the inquiry letter, and that it could continue to operate tax-free going forward without obtaining a new permit. Yet a plaintiff "is not free to define the relief it seeks in terms permitted by the Anti-Injunction Act while ignoring the ultimate deleterious effect such relief would have on the Government's taxing ability."  *Int'l Lotto*, 20 F.3d at 591.

The Plaintiff further argues that "Gulf Coast [cannot] pay the tax and seek drawback, as drawback for tobacco products exported by an export warehouse proprietor only applies to tobacco products exported to a foreign country."  (Pl's Memo., p. 24 n. 7 (citing 27 C.F.R. § 44.221).)  Gulf Coast is raising a red herring.  Drawbacks are an administrative remedy allowing a taxpayer to recover taxes paid on tobacco products when the tobacco products are exported after tax is paid, which may occur when the seller does not have a permit to operate an

---

[3] Indeed, to the extent this tax is divisible, Gulf Coast may be able to pay the tax on a single shipment and seek review.

14363649.7

export warehouse. 27 C.F.R. §§ 44.221-44.231. This remedy is administrative in nature and is

wholly separate from the refund procedures for tobacco taxes. *See* 26 U.S.C. § 6423(c)

(discussing requirements for claiming a refund and differentiating between a refund and a

drawback); 26 U.S.C. § 7422 (providing limits on a refund suit).  In other words, whether Gulf

Coast could seek a drawback does not prevent it from filing a claim for refund.

### ii.  The Judicial Exceptions to the Anti-Injunction Act Do Not Apply Here.

Gulf Coast argues that its claims fall within a judicial exception to the Anti-Injunction

Act announced in *South Carolina v. Regan*, 465 U.S. 367 (1984). There, the State of South

Carolina challenged the denial of tax-exempt interest on "bearer bonds" which it wished to issue.

*Id.*  But because the State was not the taxpayer, it did not have a refund suit available to it.  *Id.* at

380-381.  The owners of the bonds would have to challenge the imposition of tax, and the

Supreme Court concluded that the owners would not likely be able to raise the constitutional

claims of the state and the state would not likely be able to identify the owners or convince them

to raise the state's claims.  *Id.*  This exception allows for injunctive relief for the "almost unique"

fact scenario where no other remedy is available to the taxpayer for review.  *See RYO Mach.*,

696 F.3d at 472 (quoting *Judicial Watch v. Rossotti*, 317 F.3d 401, 408 n.3 (4th Cir. 2003)).

Gulf Coast alleges this exception applies here because the ultimate purchaser of the

tobacco products (*i.e.,* ship vessel masters) would need to pay the tax.  (Pl's Memo., p. 23.)  But

Gulf Coast is subject to the excise tax either as a transferee under 26 U.S.C. § 5703(a)(2) or

pursuant to the penalty provisions of 26 U.S.C. § 5761(c), it has been informed of its tax liability

via the inquiry letter, and it can thus pay the tax for one or more periods directly to TTB.  Once it

pays that tax, Gulf Coast can file an administrative claim for refund; and if the claim is denied or

not acted upon in six months, Gulf Coast can file suit in federal district court or the Court of

Federal Claims.  The availability of the refund remedy means the judicial exceptions cannot apply here.  *E.g.*, *Maze v. Internal Revenue Serv.*, ___ F. Supp. 3d ___, ___,  2016 WL 4007075, at \*13 (D.D.C. July 25, 2016) (finding the judicial exceptions do not apply when a taxpayer can pay the tax and seek a refund); *RYO Mach.,* 696 F.3d at 472-473 (holding that a challenge to a TTB's permit requirement did not fall under *Regan* because taxpayer could get retailers to sue on its behalf).

No other judicial exception to the Anti-Injunction Act applies. *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 7 (1962).  The *Williams Packing* exception requires that a taxpayer demonstrate that even when the facts are viewed in the most favorable light for the United States, the United States cannot prevail on the merits.  *Id*. at 7 (requiring that it be "clear that under no circumstances could the Government ultimately prevail").  Whether the United States can prevail is "to be determined on the basis of the information available to it at the time of suit.  Only if it is then apparent that, under the most liberal view of the law and the facts, the United States cannot establish its claim, may the suit for an injunction be maintained."  *United States v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 13-14 (2008) (quoting *Williams Packing*, 370 U.S. at 7).  As explained below in Parts II through IV, the United States has provided a reasonable interpretation of its statutes and regulations, and there is a substantial chance the United States succeeds on the merits.  Accordingly, the *Williams Packing* exception to the Anti-Injunction act does not apply here.

## B.   This Court Lacks Jurisdiction to Hear Any Suit Regarding the Basic Permit.

Unlike the export warehouse permits for tobacco, the basic permits for alcoholic beverages do not directly affect the assessment or collection of a tax.  Thus, the tax Anti-

Injunction Act does not bar the suit.  That being said, the Court still lacks subject-matter jurisdiction.

TTB sent a letter to Gulf Coast on April 14, 2016, explaining that the basic permit had "automatically terminate[d]" due to an unreported change in actual or legal control.  (Compl., Ex. 9.)  At the time of such change, Gulf Coast had 30 days to file a new-permit application, 27 U.S.C. § 204(g).  If it had timely filed its application, then its old permit would have remained in effect until the new application was finally acted upon.  *Id.* Gulf Coast then could seek judicial review if its new-permit application was denied.  27 U.S.C. § 204(h).  Whether Gulf Coast files its new-permit application within 30 days or not, it only can seek judicial review of TTB's denial of that application for new permit.

Gulf Coast asserts the April 14, 2016, letter operated as a "revocation" in order to seek judicial review to which it is not entitled.  (Compl., ¶ 11.)  The courts lack appellate jurisdiction in FAA Act automatic termination cases because TTB's April 14, 2016, automatic termination letter to Gulf Coast is not an order "denying an application for, or suspending, revoking, or annulling, a basic permit" within the meaning of § 204(h).  *See Buonocore v. Bureau of Alcohol, Tobacco and Firearms*, 4 F. App,x  538, 2001 WL 180837 (9th Cir. 2001) (summarily dismissing appeal of basic permit automatic termination as it was not a revocation); *Buonocore v. ATF,* Br. for Resp., 2000 WL 34002083 (explaining that an automatic termination was not a revocation).

Even if the Court views this matter as a revocation (and it is not), the District Court lacks subject matter-jurisdiction over this alleged revocation of the basic permit, and the challenge would be untimely.  The statute governing the basic permit deprives this court of jurisdiction.  A TTB order "denying an application for, or suspending, revoking, or annulling, a basic permit"

can be appealed to a Court of Appeal, which exercises "exclusive jurisdiction."  27 U.S.C. § 204(g).  That appeal must be filed within 60 days of issuing an order.  *Id.*

When the Courts of Appeals are granted exclusive jurisdiction over the basic permit, the District Courts lack jurisdiction.  *Arrow Distilleries v. Alexander*, 24 F. Supp. 880, 882 (D.D.C 1938)*, aff'd*, 306 U.S. 615 (1939) (holding at the district-court level that no injunction could be granted while administrative proceedings on a revocation of a basic permit were pending and that any appeal of the final decision must go to the Court of Appeals); *United Distillers Prod. Corp., Amston, Conn. v. Henneberry*, 135 F. Supp. 37, 39 (D. Mass. 1955) (district court lacked jurisdiction even after finding that a letter noting an automatic termination would be considered a revocation letter if erroneous); *see Jarkesy v. S.E.C.*, 803 F.3d 9, 17 (D.C. Cir. 2015) (Congress can vest jurisdiction for an administrative challenge with the appellate court to the exclusion of other courts).  Thus, this Court lacks subject-matter jurisdiction to challenge the "revocation."

Moreover, to the extent that TTB's determination that the basic permit terminated is reviewable as a revocation (the only authorized possibility for review under the facts of this case), this petition is untimely.  The suit should have been filed by June 13, 2016, which is 60 days after the "revocation" letter issued.  27 U.S.C. § 204(g).  This complaint was not filed until July 15, 2016, and it should accordingly be dismissed as untimely.  *See United Distillers Prod. Corp. v. Henneberry*, 243 F.2d 667, 669 (D.C. Cir. 1957).  Gulf Coast's available legal remedy is now to file the new permit application, and (if the application is denied) then seek a timely hearing before the appropriate court of appeals.

## II. GULF COAST IS NOT ENTITLED TO INJUNCTIVE RELIEF.

Turning to the merits of Gulf Coast's motion, preliminary injunctive relief is an extraordinary form of relief, which "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Banks v. Harrison*, 864 F. Supp. 2d 142, 146 (D.D.C. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *Munaf v. Geren*, 553 U.S. 674, 676 (2008) ("A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."); *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) ("The power to issue a preliminary injunction, especially a mandatory one, should be 'sparingly exercised.'").   The Court may issue a preliminary injunction only when the movant demonstrates that:

> (1) there is a substantial likelihood plaintiff will succeed on the merits;
> (2) plaintiff will be irreparably injured if an injunction is not granted;
> (3) an injunction will not substantially injure the other party; and
> (4) the public interest will be furthered by an injunction.

*Barton v. District of Colum.*, 131 F. Supp. 2d 236, 241 (D.D.C. 2001) (quoting *Mova Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)); *see also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011; *Banks v. Harrison*, 864 F. Supp. 2d 142, 145 (D.D.C. 2012).

Gulf Coast argues that each of the four factors for preliminary injunction is measured on a sliding scale, allowing a weak showing on one factor to be overcome by a compelling showing of another.   Although the issue remains open, the D.C. Circuit Court of Appeals has suggested, without deciding, that the Supreme Court decision in *Winter v. National Resources Defense Council*, should be read as abandoning the sliding scale approach in favor of a "more demanding burden" requiring a movant independently to show both a likelihood of success on the merits and irreparable harm. *See Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *Davis v. Pension*

14363649.7

*Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). The Court need not resolve that open question here because Gulf Coast's claims do not satisfy either standard.

### III.  GULF COAST CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

Gulf Coast is seeking review of the notice from the TTB that its permits terminated as a matter of law.  Gulf Coast alleges these notices constitute a "revocation," and further argues that the TTB failed to meet various requirements for revoking a permit under the APA and applicable law.  After discussing the standards for APA review, the United States will explain why the TTB's actions were not arbitrary or capricious and did not violate the law.

### A.  <u>Standard for APA Review.</u>

When a party seeks review of an agency action under the Administrative Procedures Act, "[t]he entire case on review is a question of law, and only a question of law," and can be resolved on the administrative record.  *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *see American Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083-84 (D.C. Cir. 2001); *University Medical Center v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999).  A court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedures required by law," *id.* § 706(2)(D).

The scope of review, however, is "narrow," and "the court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfgr's Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  The arbitrary and capricious standard is "[h]ighly deferential," and "presumes the validity of agency decisions."  *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000).

14363649.7

Deference is especially appropriate in areas that are "complex and highly technical." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991); *see e.g., Am. Farm Bureau Fed. v. EPA*, 559 F.3d 512, 519 (D.C. Cir. 2009); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 233 (D.C. Cir. 2008).  Where a statute is silent or ambiguous on a particular issue, and an agency is authorized to promulgate regulations to implement the statute, a court must defer to the agency's reasonable interpretation of the statute.  *Chevron U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *see e.g., Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007).  An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation being interpreted." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (internal quotation and citations omitted).

## B. The Basic Permits for Importing and Wholesaling Alcohol.

It is unlawful to engage in the business of importing  or purchasing for resale at wholesale distilled spirits, wine, or malt beverages without a basic permit issued by the Secretary of the Treasury.  27 U.S.C. § 203.[4]  The purpose of the permit process is to avoid "racketeer and hoodlum influence" in the alcohol industry and to ensure strawmen are not put to cover such influence.  *Seaway Beverages, Inc. v. Dillon*, 319 F.2d 722, 724 (D.C. Cir. 1963).  To obtain a basic permit, an importer or wholesaler like Gulf Coast must file an application with the TTB. 27 U.S.C. § 204; 27 C.F.R. § 1.25.

Section 204 of the Federal Alcohol Administration Act draws clear distinctions between revocations and automatic terminations of the permit by a change in ownership.  A basic permit

---

[4] While commerce in beverage alcohols is regulated under title 27 of the United States Code, the taxation of those beverages can be found in Chapter 51 of the Internal Revenue Code (Title 26, U.S.C.).  TTB issued regulations for both alcohol and tobacco are found in Title 27 of the Code of Federal Regulations, which covers Alcohol, Tobacco Products, and Firearms.

14363649.7

continues "until suspended, revoked, or annulled as provided herein, or voluntarily surrendered; **except that** . . . if transferred by operation of law or if actual or legal control of the permittee is acquired, directly or indirectly, whether by stock-ownership **or in any other manner**, by any person, then such permit shall be **automatically terminated** at the expiration of thirty days thereafter" unless an application for a new permit is timely filed. 27 U.S.C. § 204(g) (emphases added). By drawing this distinction between revocation and automatic terminations, the statute places an affirmative duty of self-reporting ownership changes on the permittees, rather than burdening the TTB with an otherwise unwieldy responsibility for compliance monitoring. Here, Gulf Coast's claim of a procedural error rests on the patently incorrect allegation that its permit was "revoked." Gulf Coast ignores that a permit can "automatically terminate" upon a change in ownership or control.

If TTB determines that an existing permit is revoked, suspended, or annulled due to certain specified wrongdoing of the permittee, the TTB must issue an order to the permittee notifying them of the alleged wrongdoing and provide an administrative hearing. 27 U.S.C. §§ 204(e), (f). After the TTB rules, the permittee then has 60 days to appeal the decision "denying an application for, or suspending, revoking, or annulling, a basic permit" to a Circuit Court of Appeals by filing a written petition. 27 U.S.C. § 204(h). If the petition is timely filed, then the appellate "court shall have exclusive jurisdiction to affirm, modify, or set aside such order, in whole or in part." *Id.*

In the context of a termination due to a change in ownership, the old permit remains in effect until the application is ruled upon if the permittee files a new application within 30 days. 27 U.S.C. § 204(g). Unlike denials, revocations, suspensions and annulments, the automatic termination provision in section 204(g)(1) does not have a provision authorizing judicial review

by the courts of appeals.  *See* 27 U.S.C. § 204(h) (excluding automatic termination from its judicial review provisions).  Where an automatic termination occurs, the former permittee may file a new application.  If the new permit application is denied, the former permittee-applicant may challenge that determination in the appropriate court of appeals.  *United Distillers*, 243 F.2d at 668-669 (holding TTB's predecessor did not err in determining an automatic termination occurred without first holding a hearing).

### C.  **The Export Warehouse Proprietor's Permit for Tobacco.**

The domestic sale of tobacco products is subject to an excise tax on the manufacturers or importers.  26 U.S.C. § 5703(a)(1).  An export warehouse stores tobacco products for subsequent shipments beyond U.S. internal revenue jurisdiction.  26 U.S.C. §§ 5702(h), (i).  A properly qualified export warehouse is not required to pay the federal taxes on these products if they are removed for exportation or consumption beyond U.S. internal revenue jurisdiction.  *Id*.; 26 U.S.C. § 5704(b).  An export warehouse proprietor may become liable for the excise tax and significant penalties if it receives tobacco products that did not have the excise tax paid by the manufacturer if such proprietor is not lawfully operating and exporting the tobacco products. 26 U.S.C. §§ 5703(a)(2); 5704(b); 5761(c) (imposing penalties).  Export warehouse proprietors may receive tobacco products and can transfer them without payment of tax, but only if such transfers are for exportation or consumption beyond U.S. internal revenue jurisdiction in accordance with TTB regulations.  26 U.S.C. § 5704(b).

Because export warehouses deal in untaxed tobacco products, their improper operation poses significant jeopardy to the revenue, and permits must be obtained prior to operation. 26 U.S.C. § 5712.  When dealing with a corporation, Congress explicitly requires TTB to investigate **both** the corporation and its "officer, director, or principal stockholder."  *Id*.  Like

14363649.7

basic permit, TTB is charged with ensuring that the responsible individuals have the acumen to maintain the business within the confines of the tobacco tax law, and that those individuals do not have a criminal past that would make it likely for them not to comply with the tax laws. 26 U.S.C. §§ 5712(1)-(3).

This permitting process must occur before the export warehouse proprietor commences business and "at such other time as the Secretary shall by regulation prescribe." 26 U.S.C. § 5713. The regulations require a new application to be filed anytime there is a change to the ownership or control of an export warehouse proprietor. 27 C.F.R. §§ 44.104-44.107. A change in the stock ownership of a corporation has a clear and specific effect on the permit process, just like with the basic permit for alcohol. *Id*. § 44.107. The regulations provide:

> Where the issuance, sale, or transfer of the stock of a corporation, operating as an export warehouse proprietor, results in a **change in the identity of the principal stockholders** exercising actual or legal control of the operations of the corporation, the corporate proprietor shall, **within 30 days after the change occurs, make application for a new permit; otherwise, the present permit shall be automatically terminated** at the expiration of such 30-day period, and the proprietor shall dispose of all cigars, cigarettes, and cigarette papers and tubes on hand, in accordance with this part, make a closing inventory and closing report, in accordance with the provisions of §§ 44.146 and 44.151, respectively, and surrender his permit with such inventory and report. **If the application for a new permit is timely made, the present permit shall continue in effect pending final action with respect to such application.**

*Id*. (emphases added). The regulation clearly requires an export warehouse proprietor to submit a new permit application within 30 days whenever there is any change in the principal stockholder or the permit will terminate within 30 days after such change. In circumstances other than an automatic termination, the export warehouse permit process for tobacco allows for suspension or revocation of permits. 26 U.S.C. § 5713(b). The suspension or revocation can be

subject to a show-cause hearing for various wrongdoings, followed by a determination by the Secretary of the Treasury (or his delegate). *Id*.

The requirement that a new permit be requested after a change in stock ownership or control, with respect to both alcohol and tobacco is crucial to ensuring that TTB has the opportunity to determine if the new individuals exercising actual or legal control will act lawfully in the alcohol and tobacco industries, as is required by statute and the regulations quoted above. *See* 26 U.S.C. § 5712; 27 U.S.C. § 204(a). The purpose of both the export warehouse permit for tobacco and the basic permit for alcohol is to "exclude undesirable persons [like bootleggers] from holding permits." *See Mid-Valley Distilling Corp. v. Decarlo*, 161 F.2d 485, 488 (3d Cir. 1947) (discussing basic permits). Without knowing the identities of the individuals exercising actual or legal control of the businesses, TTB's efforts to regulate in these areas is highly circumscribed. As the D.C. Court of Appeals has noted, these types of permits "require[] full disclosure and good faith on the part of applicants for such privileges." *Middlesboro Liquor & Wine Co. v. Berkshire*, 133 F.2d 39, 41 (D.C. Cir. 1942).

> **D. TTB's Determination that Gulf Coast Failed to Comply with the Change of Ownership Regulation and Statutes Was Supported by the Record, Was Not Arbitrary or Capricious, in Violation of Procedural Protections, nor "Rulemaking" Requiring Notice and Comment.**

TTB's determination that a change-in-ownership occurred and that Gulf Coast failed to comply with the required new permit application is supported by the record and did not amount to an arbitrary or capricious conclusion that Gulf Coast underwent a change in ownership within the meaning of 27 C.F.R. § 44.107, 27 U.S.C. § 204(g). The TTB regulation and the related provisions of the Internal Revenue Code (*i.e.*, 26 U.S.C. §§ 5712, 5713, 5721, 5722) regarding export warehouse permits do not provide guidance as to the meaning of "change in the identity,"

"principal shareholders," or "control."  The basic permit discusses change by transfer, by operation of law, by a change in legal control through stock ownership, or "any other manner." 27 U.S.C. § 204(g).  Accordingly, TTB resolved this ambiguity (to the extent that any such ambiguity exists) and concluded that a transfer of a controlling interest to a spouse upon the death of another spouse constituted a "transfer of ownership" for the purpose of the applicable regulations.  *See Auer*, 519 U.S at 461-62.

TTB's interpretation — that the transfer of stock includes a transfer from one spouse to another — is consistent with the overarching anti-abuse purpose of the change of ownership regulation and statute for the basic permit.  *See Mid-Valley*, 161 F.2d at 489.  A broad interpretation of the meaning of a "transfer in ownership" or a change in "actual or legal control" is consistent with the goal of mitigating the potential for abuse by basic permittees and export warehouse proprietors, because the identity of the owner(s) of a company is crucially important for facilitating TTB's oversight activities.  *Id.* ("It was also the intention of Congress to prevent a person, unable to qualify for a permit . . . , to obtain one indirectly from a corporation [or a trust] already possessed of one.").  Congress clearly intended that there be close scrutiny of export warehouse proprietorships and basic permit holders as well as their owners and operators, as reflected by the statutory mandate that TTB investigate not just the corporation applying for the permit, but also its officers, directors, and principal shareholders.  26 U.S.C. § 5712(a)(3); 27 U.S.C. § 204(a)(2).

### i.    A Change in Ownership Occurred Here.

Gulf Coast's historical actions are consistent with Defendant's interpretation that a change in stock ownership and actual control occurred here and fall within the applicable regulations.  In 1994, Gulf Coast reported a change in stock ownership indicating that Salem

14363649.7

Geller owned 450 shares, Barbara Geller owned 450 shares, and their son owned 100 shares. (Compl, Ex. 1.)  Salem Geller's obituary supports that he was the "primary owner and operator" before his death.  (Compl., Ex. 2.)  The obituary does not report that Salem and Barbara Geller ran the company jointly.  *Id*.

When Salem Geller died, Barbara Geller ultimately received his shares (initially as the executrix and then in her individual capacity).  She became the 90% majority owner of Gulf Coast.  TTB's determination that this constituted a change or transfer of ownership was not clearly erroneous.  Even if Barbara Geller acquired control through community property upon the death of Sam Geller, as Plaintiff contends, the transfer is by operation of law.  The regulations provide that a transfer by operation of law is a change in ownership.  Accordingly, TTB's determination was not clearly erroneous.

Moreover, there was a change in actual control of Gulf Coast that was not reported.  After Salem Geller's death, General Manager Jay Goldstein exercised actual control by using his dead boss's signature stamp to file reports with TTB.  (Gov't Ex. 101, Interview Notes.)  Goldstein further stated to TTB agents that he exercised control and that Barbara Geller took no active part in the control of the company even though she was technically now the majority owner.  *Id*.  Gulf Coast never reported this exercise of actual control to TTB.  *Id*.

Gulf Coast raises two arguments in an effort to challenge the TTB's reasonable analysis of what constitutes a change in ownership.  First, Gulf Coast argues that Texas community property law gave Barbara Geller actual ownership and control over the stock.  (Pl's Memo., p. 19.)  Second, Gulf Coast argues that the tax law must treat spouses as a single entity if they are both stockholders in a corporation that is taxed under Subchapter S of the Internal Revenue

Code.  *Id.*, p. 18.  Those arguments are without merit and do not render the TTB's interpretation unreasonable.

### ii.     Texas community-property law is not relevant.

Gulf Coast argues that there was no transfer or change in ownership because both husband and wife owned the stock under Texas community property laws.  But Texas law does not determine what constitutes a change in "actual or legal control" for purposes of federal tobacco excise taxes.  *See* U.S. Const. Art. VI, cl. 2.  While Texas law may determine the rights that taxpayers have in the stock as property, federal law governs the consequences of those rights.  *See United States v. Craft*, 535 U.S. 274, 284-285 (2002) (noting that community property laws do not override the federal tax law governing its liens); *United States v. Mitchell*, 403 U.S. 190, 204 (1971) (state-law right to renounce marital property irrelevant for federal tax consequences); *United States v. Bess*, 357 U.S. 51, 55 (1958) (federal law attaches consequences to ownership of property for purpose of federal tax lien).

Moreover, the Internal Revenue Code is replete with examples where Congress considers spouses to be two different people for tax purposes even if they are allowed to engage in certain activities jointly.  For example, if the Gellers filed their income tax returns separately, they would have been required to each report 50% of the income or losses from Gulf Coast even if that income would be attributable to the community under state law.  26 U.S.C. § 66.  Indeed, spouses (even in a community-property state like Texas) must elect each year to file their tax return jointly or they are otherwise treated as two separate taxpayers.  *See* 26 U.S.C. § 6013. And transfers between spouses are not simply ignored.  Congress has created a rule that the interspousal transfers do not create a gain or a loss.  26 U.S.C. § 1041(a)(1).  The transfer itself is still acknowledged and treated as a gift.  26 U.S.C. § 1041(b).  These provisions demonstrate that

Congress has not been struck blind by community property laws or marital status in general. Federal tax laws instead recognize that spouses are two separate individuals even if they are treated as a single entity for various purposes.

> ### iii. The rules governing qualification as an S corporation are a red herring.

Gulf Coast also argues that for the purpose of federal tax law, the spouses and should be treated as one and the same. This argument is without merit.

Subchapter S of the Internal Revenue Code allows owners of certain small business corporations to elect to skip the corporate-level income tax by becoming an "S corporation." 26 U.S.C. § 1363(a). Instead, the corporation's items of income, loss, or deductions generally pass through to the stockholders and are reported on each stockholder's income tax return. 26 U.S.C. § 1366(a). Other taxes, such as employment and excise taxes, are imposed at the corporate-level. To qualify as an S corporation, the corporation must meet certain requirements, including having fewer than 100 shareholders. 26 U.S.C. § 1361(b)(1)(A).

The statute defining S corporations has a specific definition of what constitutes a shareholder. Spouses are treated as a single shareholder for purposes of determining whether a corporation can qualify as an S corporation. 26 U.S.C. § 1361(c)(1)(A). Gulf Coast alleges that because the term "S corporation" applies to the entire Internal Revenue Code, all of the rules governing what constitutes a shareholder of an S corporation also apply. Gulf Coast's argument fails for three reasons.

First, Gulf Coast misquotes the relevant statute. The provision treating spouses as a single stockholder is <u>explicitly limited</u>. The statute provides that the rule stating that husband and wife are treated as a single person only applies "[f]or purposes of subsection [1361](b)(1)(A)." 26 U.S.C. § 1361(c)(1)(A) (emphasis added). Subsection 1361(b)(1)(A), in

26

turn, requires an S corporation to have fewer than 100 stockholders.  26 U.S.C. § 1361(b)(1)(A).

Gulf Coast's entire argument rests on a subsection that is explicitly limited to whether a

corporation qualifies as an S corporation.  By its terms, the rule has no application to other

Internal Revenue Code provisions.

Second, Gulf Coast's argument cannot stand when the other provisions of Subchapter S

are examined.  For example, the provisions governing transfers between spouses of S corporation

stock, found in  26 U.S.C. § 1366(d)(2)(B)[5] establish how to treat transfers between spouses

when there are losses that exceed one of the spouse's basis in the stock, which would normally

be the cost of acquiring the stock.  *Id.*  And as discussed above, there are sections outside of

Subchapter S that treat spouses as separate individuals.  Gulf Coast's overbroad theory would

render these provisions meaningless.

Third, looking at the issue more broadly, an S corporation is a creature of federal <u>income</u>

tax law, not <u>excise</u> tax law.  The provision governing the election to be an S corporation is

explicitly limited to income taxes when it states that the S corporation "shall not be subject to the

taxes imposed by" Chapter 1 of Subtitle A of the Internal Revenue Code, which governs income

taxation.  26 U.S.C. § 1363(a).  Chapter 1 of Subtitle A governs income taxes.  Title 26, U.S.C.,

Subtitle A., Ch. 1.  Here, the relevant portion for the export warehouse proprietorships is found

in Chapter 52 of Subtitle E, which governs tobacco excise taxes.  Title 26, U.S.C., Subtitle E, Ch.

52.

Turning to the alcohol basic permit, the provisions for the granting, revocation, and

renewal of the permit are located in Title 27 of the United States Code, which is not a part of the

---

[5] Providing that with respect to transfers of stock between spouses "any loss or deduction described in subparagraph (A) [governing the carry forward of losses that exceed the stockholders basis in the stock] with respect [to] such stock shall be treated as incurred by the corporation in the succeeding taxable year with respect to the transferee."  *Id.*

14363649.7

Internal Revenue Code.  Thus, even if Gulf Coast's S corporation theory had any sort of merit, it would still be totally irrelevant for the basic permits.  Indeed, this Circuit previously approved treating a stock transfer between husband and wife as a "transfer" constituting "a change in the control and management of the business . . . ." when looking at basic permits for alcohol.  *See United Distillers Prods. Corp,* 243 F.2d at 668.

Accordingly, the S corporation status is not relevant to whether or not Gulf Coast underwent a transfer in ownership.  *See United States v. BDO Seidman, LLP*, 492 F.3d 806, 825 (7th Cir. 2007) (noting in a summons enforcement case that S corporation status "merely means that [S corporations] do not pay directly income taxes.  Section 1363 does not exempt S corporations from other taxes imposed by the [Internal Revenue Code], such as  . . .  excise taxes . . . .").  Thus, Gulf Coast is simply incorrect that 26 U.S.C. § 1361 conflicts with TTB's analysis.

E.    **TTB's Process Comports With Its Own Statutes and Regulations, as well as the APA.**

Gulf Coast's contends that this Court should restore its export warehouse permit and basic permits because TTB allegedly did not provide Gulf Coast with adequate notice, hearing, and an opportunity to achieve compliance prior to revoking, withdrawing, suspending, or annulling Gulf Coast's permit.  As demonstrated below, Gulf Coast's argument should be rejected because it relies on a misapplication of the APA, as well as Titles 26 and 27 of the United States Code, and TTB's own regulations governing export warehouse permits.  Moreover, to the extent that Gulf Coast was entitled to heightened procedural protections, it has not shown that this alleged error led to any prejudice or harm.

14363649.7

### i. Gulf Coast's was not entitled to notice and a hearing because its permits terminated by its own terms.

Gulf Coast asserts that the TTB's actions violate the Administrative Procedure Act because they fail to provide notice and a hearing. (Pl's Memo, pp. 15-18.) Yet when reviewed together, the APA, Titles 26 and 27 of the United States Code, and TTB's regulations create a consistent procedural framework governing the (1) application, (2) withdrawal, suspension, revocation, or annulment, and (3) renewal of the permits. Gulf Coast ignores the renewal process to try to obtain an unnecessary notice and hearing.

Sometimes, a permit holder engages in certain prohibited actions, which generates a revocation, suspension, or annulment. *See* 26 U.S.C. § 5713(b)(1)(D), 27 U.S.C. §§ 204(e), (h). In those situations, there is an administrative appeal process, so that there is an opportunity to be heard on the alleged bad acts. *Id*.

By contrast, both the basic permit for alcohol and the export warehouse proprietor permit for tobacco terminate upon an unreported change in actual or legal control. For basic permits, Congress required a basic permit holder to file a new permit "if transferred by operation of law or if <u>actual or legal control</u> of the permittee is acquired, directly or indirectly, whether by stock-ownership or in <u>any other manner</u>, by any person." 27 U.S.C. § 204(g) (emphasis added). For export warehouse proprietorships, Congress gave TTB discretion to issue regulations about when a new application should be required. 26 U.S.C. § 5712(a). TTB, in turn, issued a regulation that is similar to the process for the basic permit and requires a new permit application to be filed upon a change in the principal stockholders exercising actual or legal control over the corporation. 27 C.F.R. § 44.107.

29

Under both regimes, a permittee that timely comes forward will have its permit extended until TTB finally rules on the new permit application.  27 U.S.C. § 204(g); 27 C.F.R. § 44.107.  If a new application is not timely filed, the permit automatically terminates as a matter of law.  *Id*.  If a new application is filed after the permit automatically terminates, the applicant can seek judicial review of TTB's denial and raise the impropriety of the determination that the prior permits automatically terminated.  *See United Distillers*, 243 F.2d at 668-669.  For the export warehouse permit, a refund suit would allow the taxpayer to indirectly challenge TTB's determination.

Gulf Coast argues that the TTB's actions somehow violate the APA, specifically 5 U.S.C. § 558(c).[6]  The three sentences of section 558(c) each govern different licensing scenarios:

| | |
|---|---|
| *First sentence:* | "When **application is made** for a license required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons and within a reasonable time, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title or other proceedings required by law and shall make its decision." |
| *Second sentence:* | "Except in cases of willfulness or those in which public health, interest, or safety requires otherwise, the **withdrawal, suspension, revocation, or annulment** of a license is lawful only if, before the institution of agency proceedings therefor, the licensee has been given— |
| | (1) notice by the agency in writing of the facts or conduct which may warrant the action; and<br>(2) opportunity to demonstrate or achieve compliance with all lawful requirements." |
| *Third sentence:* | "When the licensee has made timely and sufficient application for a **renewal or a new license** in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency." |

---

[6]  The APA defines the term license to include permits.  5 U.S.C. § 551(8).

5 U.S.C. § 558(c) (emphasis added).  Each sentence of 558(c) is "mutually exclusive of the other," with each covering a different scenario in a permittee's life cycle.  Attorney General's Manual on the APA, 89 (1947).  If the APA applied, this case would be governed under the third sentence.

The permits here follow the third sentence of section 558(c).  *Compare* 27 U.S.C. § 204(g) and 27 C.F.R. § 44.107, *with* 5 U.S.C. § 558(c) (third sentence).  The permits terminated under their own terms unless a timely new application was filed.  When this third-sentence scenario occurs, TTB need not take any action.  It is the export warehouse proprietorship or basic permit holder that must act first and file a new application.  "The burden is on private parties to apply for licenses or renewals."  Administrative Procedure Act, Legislative History, S. Doc. No. 248, at 368 (1946) (quoted in *Committee for Open Media*, 543 F.3d at 382 n. 32.).

The D.C. Court of Appeals' decision in *United Distillers* is controlling.  *United Distillers*, 243 F.2d at 669.  There, a basic permit holder had a change in ownership.  *Id.*, at 668.  TTB's predecessor, upon learning of the change, issued a letter to the permittee, noting that the permit automatically terminated and informing the permittee that it needed to file a new application.  *Id.* When the new application was denied, the permittee filed an appeal with the D.C. Court of Appeal.  *Id.*  On appeal, the permittee alleged the agency erred by determining there was an automatic termination without an administrative hearing.  *Id.*  The Court denied the permittee's argument and further affirmed the denial of the new permit.  *Id.*  This Court should similarly find that there is no need for a hearing as the permit automatically terminated and TTB has not denied a request for a new permit since Gulf Coast has not applied for a new permit.

14363649.7

Gulf Coast ignores that it was required to file a new application.  Indeed, this duty was

clear on the face of the permits, which says that they would remain in effect until they

automatically terminated by a change in proprietorship or control.  Gulf Coast should not be

allowed to escape its affirmative duty by blaming TTB and seeking a hearing that is not

authorized under the statutes, regulations, or the APA.

### ii.   Gulf Coast cannot show prejudice from not receiving an additional hearing.

Even assuming that Gulf Coast is correct that the TTB should have provided an

additional hearing or "opportunity to achieve compliance," it is incorrect that TTB's

determination necessarily must be set aside.  *See* 5 U.S.C. § 706 ("due account shall be taken of

the rule of prejudicial error").  This Circuit has observed that "[i]f the agency's mistake did not

affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and

remand for reconsideration."  *PDK Labs. Inc. v. Drug Enf. Agency*, 362 F.3d 786, 799 (D.C. Cir.

2004).  The factors considered in a harmless error analysis are case specific.  *Ozark Auto.*

*Distrib., Inc. v. NLRB*, 779 F.3d 576, 586 (D.C. Cir. 2015).  The burden of proving that a

procedural error was prejudicial "normally falls on the party attacking the agency

determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009).

Gulf Coast has been unable to identify how it was harmed by TTB's alleged procedural

errors.  An additional hearing would serve no purpose:  Gulf Coast has nothing more to say.

Gulf Coast reported Barbara Geller and Salem Geller each owned 450 shares in 1994.  After

Salem Geller's death, Barbara Geller owned 900 shares (or a 90% interest).  Those facts are

undisputed and TTB has reasonably interpreted that this action both constitutes a transfer and a

change in legal and actual control.

32

Gulf Coast's argument conflates the notice and hearing requirement for permit revocation with the administrative reporting requirements for certain specific permit-related changes in control.  If adopted, this argument will undermine the need for timely self-reporting as contained in the regulations.  Gulf Coast alleges an export warehouse proprietor could undergo an unlimited number of changes in ownership structure, safe in the knowledge that it would have an opportunity to cure any failure to report the change once caught by TTB.

> **iii.    TTB's Determination that Gulf Coast Underwent a Change of Ownership Was Not Rulemaking.**

Gulf Coast asserts that TTB's notice that its permit had terminated as a matter of law constituted rulemaking without employing the notice and comment procedures provided for by the APA.  5 U.S.C. §§ 553 and 558.  As explained below, Gulf Coast's argument should be rejected because TTB's action was at most an informal adjudication, rather than a rulemaking. Thus TTB's actions were not subject to formal notice and comment.

The D.C. Circuit Court of Appeals has held that "**adjudicatory decisions** are not subject to the APA's notice-and-comment requirements."  *Blanca Tel. Co. v. FCC*, 743 F.3d 860, 867 (D.C. Cir. 2014) (emphasis added), *cert. denied*, 135 S. Ct. 230 (2014).  An agency's action with respect to a specific permit constitutes precisely the type of informal adjudication that falls outside the ambit of rulemaking.  As this Court has succinctly explained:

> The APA defines "adjudication" as the process of issuing an "order", 5 U.S.C. § 551(7), which in turn is defined to include "licensing," 5 U.S.C. § 551(6). "Licensing" is defined to include "the grant of a license," 5 U.S.C. § 551(9), which is defined to include an agency "permit." 5 U.S.C. § 551.

*Nat'l Wildlife Fed'n v. Marsh*, 568 F. Supp. 985, 992 n.5 (D.D.C. 1983).  Notably, Gulf Coast cannot provide any authority for the theory that informing a taxpayer that its permit has terminated constitutes a rulemaking activity.

Gulf Coast contends that TTB must engage in rulemaking because this was the first time

TTB was called upon to apply 27 C.F.R. § 44.107 to the transfer of shares between spouses.

Assuming without agreeing that Gulf Coast is correct that this is the first adjudication involving

a change in ownership due to a transfer from a decedent to a spouse, it is of no moment, that

TTB's ruling involved a new application of existing law. "Orders handed down in adjudications

may establish broad legal principles," *Cent. Texas Tel. Co-op., Inc. v. FCC*, 402 F.3d 205, 210

(D.C. Cir. 2005).  Adopting Gulf Coast's argument would force TTB to choose between two

untenable positions:  drafting extraordinarily broad and detailed regulations, or employing the

notice and comment requirements (which, as the Court is aware, often can take a much extended

period) each and every time that a permitting decision involved a new fact pattern.  This is

simply not the law.  *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995) (agency not

required to draft regulations that will "address every conceivable question").  Nor should it be.

Gulf Coast's unrealistic requirements would bring administrative processes to a grinding halt.

Gulf Coast's argument should be rejected, and the Court should find that TTB's interpretation is

reasonable and should enter judgment in the United States' favor.

## IV. GULF COAST CANNOT MEET THE REMAINING FACTORS FOR INJUNCTIVE RELIEF

As discussed above, Gulf Coast cannot show a likelihood of success on the merits, which

should suffice to justify denial of the preliminary injunction in itself.  Gulf Coast also cannot

meet the remaining factors for injunctive relief.  Gulf Coast cannot show the remaining factors,

which are that: (a) that it will be irreparably injured if an injunction is not granted; (b) an

injunction will not substantially injure the other party; and (c) the public interest will be

furthered by an injunction.  *E.g.*, *Barton*, 131 F. Supp. 2d at 241.

### A.      Gulf Coast Has Not Demonstrated that It Will Suffer Irreparable Harm Absent an Injunction.

Not only has Gulf Coast failed to suffer a harm that is redressable by this Court at this time, any harm it suffered is not irreparable.  "The concept of irreparable harm does not readily lend itself to definition."  *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007) (denying motion for preliminary injunction).  Harm that is speculative or contingent upon other events is not sufficiently irreparable.  *See Comm. in Solidarity with the People of El Salvador v. Sessions*, 705 F. Supp. 25, 28 (D.D.C. 1989) (denying motion for preliminary injunction); *Northgate Assocs., LLLP v. N.Y. Credit Funding I, LLC*, 2008 WL 3200630, *9 (M.D.N.C. Aug. 5, 2008) (denying motion for preliminary injunction where "alleged irreparable harm thus remains contingent on future events which may or may not develop").  Under these standards, Gulf Coast's alleged harm is not irreparable.

Of particular importance in this matter, irreparable harm cannot arise from Gulf Coast's own wrongful actions (or inaction).  *Safari Club Int'l v. Jewell*, 47 F.Supp.3d 29, 32-33 (D.D.C. 2014); *see Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (holding that litigant cannot "be heard to complain about damage inflicted by its own hand"); *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001) (alleged harm cannot be "self-inflicted") (citations omitted).  Gulf Coast refused to follow procedures because they were "onerous."  (Gov't Ex. 101, Interview Notes).  Indeed, Gulf Coast continued to use its dead-owner's signature stamp to evade review.  (Gov't Ex. 102, Reports.)  Gulf Coast has refused to file a new permit application for the past several months since receiving notice from the TTB of the termination.  Those actions should not be granted countenance.

Gulf Coast certainly is in a less desirable position than if it had properly followed the prescribed regime for permit control and stock ownership-related changes.  Yet the alleged harm

is nothing more than the loss of money, time, or energy.  Those sorts of harms are not irreparable

harms.  *Sampson v. Murray*, 415 U.S. 61, 90 (1974).  "Temporary deprivation of money, alone,

generally cannot constitute irreparable harm."  *Tatar v. Mayer*, 2013 WL 4777143, *2 (E.D.

Mich. Aug. 6, 2013), *quoting Jarro v. United States*, 835 F. Supp. 625, 630 (S.D. Fla. 1992); *see

Wood Rich Constr. Co., Inc. v. United States*, 1996 WL 377193, *1-2 (E.D. Pa. June 26, 1996).

Because Gulf Coast has not shown that it would suffer any more than monetary damages if it

applied for a new application and paid the taxes it now owes (and continues to accrue) from its

continued efforts to operate as an export warehouse proprietorship without a proper permit.

### B.    Gulf Coast Has An Adequate Remedy At Law.

Gulf Coast has an adequate remedy at law.  For the basic permit, Gulf Coast can file a

new permit application.  If denied, Gulf Coast can then seek judicial review with the Court of

Appeals.  27 U.S.C. § 204(g), (h).  For the export warehouse permit, Gulf Coast can pay the

amount due for any tax period, file an administrative claim for refund, and then bring a suit if

that claim is denied.  28 U.S.C. § 1346; 26 U.S.C. §§ 6423, 7422.  Gulf Coast can raise its

argument that no change of ownership occurred in arguing that no excise taxes are owed. Should

the TTB deny the refund claim, Gulf Coast can seek a determination of the tax liability in court.

*Id.*

### C.    The Balance of Harms and Public Policy Both Weigh Against Granting Gulf Coast its Injunction.

Gulf Coast cannot show that the balance of harms and public interest weigh in its favor.

*Cf. Nken v. Holder*, 556 U.S. 418, 435-436 (2009) (explaining in the context of a stay pending

appeal that the final two factors of the traditional preliminary injunction inquiry — harm to the

opposing party and the public interest — merge when the federal government is the opposing

party).  The Supreme Court has cautioned that "courts of equity should pay particular regard for

the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

"Taxes are the life-blood of the government, and their prompt and certain availability an imperious need." *Bull v. United States*, 295 U.S. 247, 259 (1934). Export warehouse proprietors are put in an enviable position of selling tobacco products without payment of their high excise taxes. *E.g.,* 26 U.S.C. § 5701(a)(2) (setting tax at 57 % of sales price for large cigars). It is thus important to ensure that the proprietor and its owners are qualified and law-abiding. And with both alcohol and tobacco products, there is a need to ensure the potentially dangerous products are handled by the appropriately vetted persons.

Gulf Coast's injunctive relief arguments would allow the owners of export warehouses to evade review through silence, and to then seek injunctive relief once caught. The public is seriously harmed when a company is permitted to operate (and receive a substantial tax advantage) after flouting the TTB's regulations by refusing to file a timely application upon (a) a change in the majority of its corporate stock ownership or (b) a change in actual or legal control. The balance of harms and public interest accordingly tip in favor of denying Gulf Coast request for injunctive relief.

## V.  GULF COAST'S STATUTORY BOND IS INSUFFICIENT TO COVER THE POTENTIAL LOSSES HERE.

As explained above, Gulf Coast is not entitled to injunctive relief. But if this Court were to grant Gulf Coast relief, it should be required to post a significant bond. Under Fed. R. Civ. P. 65(c), the Court "may issue a preliminary injunction or a temporary restraining order **only if** the movant gives security in an amount that the courcleart considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R.

37

Civ. P. 65(c) (emphasis added).  Gulf Coast may owe $7.8 million, if not more.  This liability

increases with each passing day that Gulf Coast continues to improperly operate.

      Gulf Coast's surety bond of $200,000 (Compl., ¶ 37) is woefully inadequate.  TTB did

not set this bond with the notion that Gulf Coast would be operating illegally and hiding the

death of its owner from the TTB for the past several years.  While no injunctive relief should be

granted, if a bond is ordered, it should be set at least $9 million to cover the tax loss that has

already occurred and will continue to occur during the pendency of the litigation.

      In the end, Gulf Coast cannot show the likelihood of success on the merits necessary for

injunctive relief.  Gulf Coast is also unable to show that it will suffer irreparable injury because it

can file a new application with TTB, and any harms arising from its failure to file a new permit

are speculative and self-inflicted.  Likewise, Gulf Coast has an adequate remedy at law in the

form of a tax-refund suit or petition to challenge the denial of its basic permit, assuming it

applies for one and its application is denied.  Finally, the public policy behind ensuring requiring

timely disclosures by permit holders and the balance of equities weigh in favor of requiring Gulf

Coast to comply with the applicable statute and regulations.  Accordingly, Plaintiff's Motion for

Preliminary Injunction should be denied and the complaint should be dismissed for lack of

subject-matter jurisdiction.

14363649.7

## CONCLUSION

In light of the foregoing, this Court lacks subject-matter jurisdiction and this matter should be dismissed, and, alternatively, Gulf Coast has failed to establish any of the elements required to warrant the entry of injunctive relief against TTB.  Accordingly, the motion for a preliminary injunction should be denied and this matter should be dismissed as a matter of law.


Date: September 12, 2016,

Respectfully submitted,

CAROLINE D. CIRAOLO
Principal Deputy Assistant Attorney General
Tax Division

/s/  Ari D. Kunofsky
ARI D. KUNOFSKY
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 227
Washington, DC 20044
Tel: (202) 353-9187
Fax: (202) 514-6866
Ari.D.Kunofsky@usdoj.gov

CHANNING D. PHILIPS
United States Attorney

DANIEL F. VAN HORN
Civil Chief

/s/ Carl E. Ross
CARL E. ROSS
Assistant United States Attorney
U.S. Attorney's Office for the
District of Columbia
555 Fourth Street, N.W.
Washington, D.C. 20530
Tel. (202) 252-2533
Carl.Ross@usdoj.gov

39

14363649.7